J-S09017-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| RICHARD B. MAYS | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ASHLEIGH R. CORBIN | : | |
| | : | |
| Appellant | : | No. 1693 EDA 2021 |

Appeal from the Order Entered July 28, 2021,
in the Court of Common Pleas of Philadelphia County,
Domestic Relations at No(s): 0C1307838.

BEFORE:   LAZARUS, J., KUNSELMAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY KUNSELMAN, J.:                    **FILED JUNE 14, 2022**

Appellant Ashleigh R. Corbin (Mother) appeals from the order which: awarded Appellee Richard B. Mays (Father) sole legal and primary physical custody of their 9-year-old daughter N.M. (the Child); denied Mother's request that the Child relocate to Virginia; and found both parties in contempt. ***See*** 23 Pa.C.S.A. §§ 5328(a); 5337(h); 5323(g).   Mother does not challenge the substantive custody or contempt decisions but alleges that the trial judge's courtroom procedure and personal antagonism deprived her of a fair trial thereby violating her constitutional right to due process.   While we do not condone the behavior of the trial court (or Mother's counsel), we ultimately discern no error.  After careful review, we affirm.

_____

[*] Former Justice specially assigned to the Superior Court.

The relevant history begins in April 2019, when the trial court denied Mother's request that the Child relocate with her to Virginia. Mother was in the military and resided in various jurisdictions before ultimately moving to Virginia. The April 2019 order allowed Mother to exercise partial physical custody in Virginia, but Father retained primary physical custody in Philadelphia.[1]

Over the next two years, the parties' compliance with the April 2019 order ceased entirely. Mother and Father routinely withheld custody of the Child, sometimes for months at a time. Mother had obtained the Virginia-equivalent of a Protection From Abuse Order. When Mother alleged Father violated the no-contact provision of that order, apparently by discussing custody with Mother, Father was fined and temporarily incarcerated. The Covid-19 pandemic further exacerbated the parties' efforts to seek legal recourse.

By the time the trial court presided over the subject hearing, the court had before it **seven** petitions, all of which concerned either contempt or custody modification.[2] The consolidated hearing spanned two dates – March

---

[1] Mother appealed the April 2019 order, but this Court quashed her appeal as untimely.

[2] Mother brought the following petitions: petition for contempt of custody (filed on April 16, 2019); petition to modify custody (filed on July 19, 2019); petition for contempt of custody (filed on April 10, 2020); and a petition for contempt and modification of custody (filed on August 3, 2020). Father brought the following: petition for contempt of custody (filed March 9, 2020); motion for
*(Footnote Continued Next Page)*

25 and July 20, 2021. The court held the first day of the hearing remotely in accordance with Covid-19 protocols. There were immediate complications. Mother's counsel experienced technical difficulties, and it was unclear whether counsel properly submitted her pre-trial, custody-related exhibits. The court granted Father's request to continue the custody portion of the hearing; thus, the court proceeded only with the contempt portion on the first day.

The testimony centered on why the parties withheld custody in violation of the operating custody order. Mother alleged that the Child was unsafe in Father's care. Father evidently withheld custody because he felt entitled to lost custody time. Then Mother withheld because Father withheld. The court also conducted an *in camera* interview with the Child. The record does not contain a transcript of the conversation, however, because the trial court declared that the conversation was sealed. **See** N.T. 3/25/21 (Day 1), at 33-34.[3]

_____

expedited relief and contempt of custody (filed on March 1, 2021). At the hearing, Father withdrew his petition for contempt of custody (filed on February 26, 2019). Father also petitioned the court to appoint a guardian *ad litem* for the Child. We note further that the presiding trial judge changed between the April 2019 order and the subject hearing in 2021.

[3] We caution the trial court that the *in camera* interview **must** be made part of the record, pursuant to Pa.R.C.P. 1915.11(b); **see also Ottolini v. Barrett**, 954 A.2d 610 (Pa. Super. 2008) (holding that the trial court erred when it failed to make the interview part of the record at the time of the parent's appeal). Instantly, neither party objected to the court's *in camera* procedure, nor raised the issue on appeal. For the purposes of this appeal, the lack of an interview record does not impede our review.

Notably, tensions flared between Mother's counsel the trial court. At one point the court found counsel in contempt and terminated counsel's cross-examination of Father. The court did not render contempt findings after the first day. Rather, the court issued an interim order appointing the Child a guardian *ad litem* (GAL), and awarded Father interim primary physical custody until the second day of the hearing a few months later.

The GAL subsequently met with the parties and the Child and issued a report. The report noted that the Child is bright and friendly, but that she was reluctant to answer even indirect questions about her parents. The GAL found that the Child tried to be loyal to each parent. Although the GAL found both parents to be loving, the GAL had concerns with the parties' parenting.

The GAL described Father's parenting style as somewhat lax. The GAL was also concerned that Mother does not allow the Child to feel sadness about leaving Father's care. More concerning, the GAL found that Mother's refusal to co-parent negatively affected the Child both physically and emotionally. For instance, the Child once received double immunizations because the parents were not on the same page. The GAL opined that Mother uses the Child as "evidence" of Father's poor parenting to bolster her legal case – *i.e.*, Mother photographed the Child's dirty clothes after she returned from Father's care. But most alarming for the GAL was the fact that Mother had failed to ensure that the Child received necessary treatment from an endocrinologist for a medical condition called "precocious puberty." Because Mother had withheld custody in Virginia, the Child missed doctor appointments in Philadelphia.

- 4 -

The second day of the hearing was conducted in-person, on July 20, 2021. After a preliminary discussion about procedure, the court began with the substantive custody portion of the hearing. The court heard testimony from the GAL, Father, and Mother. The court also conducted a second *in camera* interview of the Child; though again, no record of the conversation was submitted.

The tensions between Mother's counsel and the trial court permeated the second day just as it did the first. One particularly heated moment involved Mother's testimony about a custody exchange. The designated location of the custody exchange was at a police station. The Child was upset during the custody exchange, so Mother asked a police officer to speak with the Child. The trial court found Mother's testimony to be duplicitous, as demonstrated by a series of pointed questions. Mother's counsel then sarcastically remarked: "Well, I'm so glad you [the court] were there and knew what happened." *See* N.T. (Day 2), 7/20/21 at 313. The court warned counsel she would be found in contempt if her behavior did not change. *Id.* at 318. The testimony ultimately resumed.

At the end of the hearing, the trial court announced it would award Father primary physical and sole legal custody. The court believed Mother was more concerned with alienating Father, than she was with the Child's best interests. The court further found that Mother's animosity toward Father caused the Child to inadvertently suffer both physical and mental harm. Ultimately, the court did not believe Mother's allegations that Father was

abusive, but that Mother actively tried to defeat the operating custody order by obtaining relief in other jurisdictions.[4] The court was also persuaded by the GAL report, which the court found to be "dead on." *Id.* at 389. After the court announced its decision, Mother was naturally upset, and when Mother volunteered her disagreement, the court noted for the record that Mother had threatened the court. *Id.* at 436.

The following week, the court issued three documents: the formal custody order; a delineation of its findings under Section 5328(a); and a delineation of its findings under Section 5337(h). *See* Orders of Court, 7/26/21. The custody order also included a provision finding both parties in contempt. The court did not order any sanctions, in apparent circumvention of 23 Pa.C.S.A. § 5323(g). *See Harcar v. Harcar*, 982 A.2d 1230, 1240 (Pa. Super. 2009) (holding that the trial court abused its discretion for failing to impose sanctions on a parent who flagrantly disregarded a custody order). However, neither party appealed that court's contempt decision or the lack of sanctions.

Mother timely-filed this appeal and presents the following three issues for our review:

---

[4] A focus of the hearing was Mother's receipt of the Virginia order of protection. The parties addressed whether the protective order was issued *ex parte* or after a hearing on the merits, and then whether the Virginia court's finding of "family abuse" constituted Father's physical abuse of the Child or Mother, or both. Ultimately, the court afforded little weight to the existence of the Virginia protection order.

1. Whether the trial court erred in failing to address the due process and procedural violations in its [Pa.R.A.P.] 1925 opinion or its earlier court order?

2. Whether the trial court violated Mother's due process rights such that her trial was unfair?

3. Whether the trial court evidenced a bias, berated Mother and her counsel, such that Mother was denied a fair trial and the court abused its discretion and otherwise erred as a matter of fact and law?

Mother's Brief at 28.[5]

Typically, we review child custody orders for an abuse of discretion. ***S.T. v. R.W.***, 192 A.3d 1155, 1160 (PA. Super. 2018). We have explained that a court abuses its discretion when, ***inter alia***, "the course pursued represents not merely an error of judgment, but…where the record shows the action is a result of partiality, prejudice, bias or ill will." ***Lewis v. Lewis***, 234 A.3d 706, 722 (Pa. Super. 2020) (citations omitted). However, when a parent presents a due process challenge – as is the case here – our review changes:

> A question regarding whether a due process violation occurred is a question of law for which the standard of review is *de novo* and the scope of review is plenary.

***S.T.***, 192 A.3d at 1160. (citations omitted).

In her first issue, Mother alleges the trial court failed to comply with the appropriate procedure following an appeal from a custody order. Under the Child Custody Act, the trial court must consider the 16 child custody factors, as well as the 10 relocation factors, when resolving a relocation petition that

---

[5] Father did not file an appellee brief, nor did the GAL, whose appointment expired with the entry of the final custody order.

would result in a changed custody award. ***See A.M.S. v. M.R.C.***, 70 A.3d 830, 836 (Pa. Super. 2013); ***see also*** 23 Pa.C.S.A. §§ 5328(a), 5337(h). After reaching a decision, the trial court must then delineate its reasons for the award on the record in open court, or in a written opinion or order. ***See*** 23 Pa.C.S.A. § 5323(d). Moreover, a trial court must delineate its reasons near the time of the decision, or else the litigant would not be able to take an effective appeal. ***See A.M.S.***; ***see also C.B. v. J.B.***, 65 A.3d 946, 953-54 (Pa. Super. 2013). After a party files a notice of appeal and concise statement of errors complained of on appeal, the trial court must issue an opinion in accordance with Pennsylvania Rule of Appellate Procedure 1925(a)(1).

Instantly, Mother argues the court erred when its Rule 1925(a) opinion failed to address the due process claims mentioned in her concise statement. ***See*** Mother's Brief at 32.

Rule 1925(a)(1) provides, in relevant part:

> [T]he judge who entered the order giving rise to the notice of appeal, if the reasons for the order do not already appear of record, shall…file…at least a brief opinion of the reasons for the order, or for the rulings or other errors complained of, or shall specify in writing the place in the record where such reasons may be found.

Pa.R.A.P. 1925(a)(1).

In its Rule 1925(a) opinion, the trial court dedicated only two sentences to Mother's allegation that the court evinced bias and violated Mother's right to due process: "In her [] appeal, Mother alleges the [t]rial [c]ourt demonstrated bias and prejudice against [Mother] and/or her counsel. The

- 8 -

transcript of record, however, does not support this assertion." Trial Court Opinion (T.C.O.), 9/14/21, at 4. Mother likens the instant case to *C.B.* to argue that the court's failure to expound upon its procedural rulings prevented her from taking an effective appeal. *See* Mother's Brief at 34. She concludes that we must vacate the custody order, and remand for a new trial with a different jurist. *Id.*

Mother's reliance on *C.B.* is misplaced. That case concerned Section 5323(d), which only obligates a court to delineate its reasons for the *custody* decision – *i.e.*, its analysis of Section 5328(a) factors, and when appropriate, its auxiliary analysis of the Section 5337(h) factors. Here, the trial court complied with Section 5323(d) when it issued thorough analyses contemporaneously with its custody order. Section 5323(d) does not obligate a court to explain its reasoning behind its *procedural* rulings, however. Thus, *C.B.* is inapposite. Meanwhile, Rule 1925(a) only obligates the court to provide a brief opinion for the errors alleged *if* the reasons do not already appear of record. *See* Pa.R.A.P. 1925(a) (emphasis added).

We conclude that the trial court complied with Rule 1925(a). First, the reasons behind the court's procedural rulings were self-evident in the record. As such, Mother was not prevented from taking an effective appeal. Second, the court's limited discussion does not impede our review. As Mother recognizes, her due process challenges present questions of law, which we review *de novo.* In this case at least, our analysis does not turn on the trial court's factual findings, which we usually glean from the Rule 1925(a) opinion.

- 9 -

Finally, we observe that even if we agreed the opinion was deficient, the remedy would not be a new trial, as Mother claims, but a remand to allow the trial court to submit a more detailed opinion and then allow the litigants to submit new briefs.[6]  Mother's first issue merits no relief.

We address Mother's second and third issues contemporaneously. According to Mother, the trial court's due process violations fall into two general categories: 1) the trial court's procedural rulings (that is, how the court conducted its hearing); and 2) the trial court's statements, which Mother claims reveal its bias.  With this in mind, we turn to the relevant law.

On multiple occasions, both the Supreme Court of Pennsylvania and the Supreme Court of the United States have acknowledged that parents enjoy a fundamental constitutional right to raise their children as they deem fit.  *See, e.g., Interest of S.K.L.R.*, 256 A.3d 1108, 1126 (Pa. 2021); *see also D.P. v. G.J.P.*, 146 A.3d 204 (Pa. 2016); *and see Troxel v. Granville*, 530 U.S. 57 (2000) (recognizing the existence of a constitutionally protected right of

---

[6] We also observe that Mother initially raised ten issues in her concise statement of errors, eight of which pertained to the substantive custody decision. *See* Mother's Brief at 28 (statement of questions involved); *cf.* Mother's Brief at 21-22 (concise statement of errors complained of on appeal).

Consequently, the trial court's opinion focused on its custody decision.  Only after the court issued its Rule 1925(a) opinion, did Mother abandon the eight issues dealing with custody.  We can certainly appreciate Mother's decision to preserve only those errors she believes warrant the most merit.  But by the same token, we cannot penalize the trial court for failing to anticipate that Mother would subsequently forgo the heart of her appeal.

parents to make decisions concerning the care, custody, and control of their children) (citing U.S.C.A. Const. Amend. 14).

Thus, procedural due process must be afforded to parents whenever they may be deprived of their right to custody. **S.T.**, 192 A.3d at 1161 (citing **J.M. v. K.W.**, 164 A.3d 1260, 1268 (Pa. Super. 2017)(*en banc*)). "It is well-settled that procedural due process requires, at its core, adequate notice, an opportunity to be heard, and the chance to defend oneself before a fair and impartial tribunal having jurisdiction over the case." **J.M.**, 164 A.3d at 1269, n.5 (citation omitted). We have explained further that "[b]oth notice and an ***opportunity to be heard must be afforded at a meaningful time in a meaningful manner***. **S.T.**, 192 A.3d at 1164 (emphasis original) (citing **Everett v. Parker**, 889 A.2d 578, 580 (Pa. Super. 2005)).

Specifically, the right of a litigant to an in-court presentation of evidence is essential to due process; when important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine witnesses. **Plowman v. Plowman**, 597 A.2d 701, 705 (Pa. Super. 1991); *see also Goldberg v. Kelly*, 397 U.S. 254, 269 (1970). Without notice and an opportunity to be heard, a party cannot properly advocate his or her position, nor expose all relevant factors from which the finder of fact may make an informed judgment. **See S.T.**, 192 A.3d at 1164 (citing **Everett**, 889 A.2d at 580).

That said, due process is flexible and calls for such procedural protections as the situation demands. **Id**. at 1161; ***see also In Interest of***

*A.N.P.*, 155 A.3d 55, 66 (Pa. Super. 2017). For instance, the Pennsylvania Rules of Civil Procedure provide:

> The rules shall be liberally construed to secure the just, speedy and inexpensive determination of every action or proceeding to which they are applicable. The court at every stage of any such action or proceeding may disregard any error or defect of procedure which does not affect the substantial rights of the parties.

Pa.R.C.P. 126.

We begin with Mother's first category of errors – namely, the court's procedure. Mother alleges the trial court's procedure was defective in the following ways:

- The court precluded Mother from preserving her objections when Mother's counsel experienced technical difficulties during the virtual hearing.

- The court precluded Mother from cross-examining Father after his direct testimony.

- The court precluded Mother from calling her witnesses.

- The court precluded Mother from authenticating and introducing more of Mother's exhibits into evidence.

- The court should have let Mother and Father perform direct and cross examination as they saw fit.

- The court did not allow Mother to complete her case-in-chief on the second date, because the court wanted to complete the hearing without issuing a second continuance.

- The court improperly deferred its decision to the GAL.

*See generally* Mother's Brief at 36-43.

Our discussion begins with Mother's allegation that the trial court hindered her participation during the virtual hearing. Mother's counsel had technical difficulties connecting to the hearing, and once connected, counsel initially had trouble being heard. With those issues seemingly resolved, the substantive portion of the hearing began with Father's direct testimony regarding Mother's contempt of custody. *See generally* N.T. (Day 1) at 35-43.

When the court turned to Mother's counsel for cross-examination, counsel asked if the court heard her objections to Father's direct testimony. *Id.* at 43. Counsel said she tried to unmute herself, and that she left a voicemail for the law clerk (apparently to alert the court of the problem). *Id.* The court said counsel's objections were not heard, and asked counsel what those objections were. *Id.* Counsel told the court that she could not remember all of them, but she stated that Father's counsel has asked leading questions and questions that called for a narrative. *Id.* at 43-44. The court simply directed Mother's counsel to begin her cross examination. *Id.*

On appeal, Mother argues the trial court erred when counsel was "blocked" or otherwise muted by the court. (The court denied this at the hearing. *Id.*) We recognize that the Covid-19 protocols have caused logistical hardships for all, and we do not necessarily share the trial court's view that it had no responsibility to accommodate counsel's technical difficulty. *Id.* at 57. However, we observe that Mother's counsel never asked for a continuance or

represented to the court that she could not proceed.[7]  Mother's counsel was given an opportunity to state her objections and inform the court of any testimony that the court should not consider.  But counsel could not provide any examples.  We conclude Mother was not prejudiced.

Next, Mother alleges the trial court erred when it terminated counsel's cross-examination of Father.  For support, Mother cites our decision in *In Interest of A.N.P.*, 155 A.3d 55 (Pa. Super. 2017).  In *A.N.P.*, the trial court excused the mother from the proceedings, after the mother told the court she was going to be sick.  When the mother attempted to come back into the courtroom, the court barred her reentry and then disallowed the mother's counsel from presenting any rebuttal testimony. *A.N.P.*, 155 A.3d at 68.  We concluded that the trial court violated the mother's right to due process by depriving her of the opportunity to be heard. *Id.*

Here, the trial court terminated Mother's cross-examination of Father after repeated warnings that counsel's questions were irrelevant and were not made in "good faith." *See* N.T. (Day 1), at 60-61.  Mother's counsel had sought to demonstrate Father's contempt – and to justify Mother's withholding of the Child – by arguing that the Child had been abused while in Father's care.  Mother's counsel attempted to establish the abuse by showing that the Child had been at a party where an attendee knowingly had Covid-19, where

---

[7] Indeed, the court had already granted Father's request to continue the custody portion of the hearing, because he did not timely-receive Mother's proposed exhibits.

the adults were consuming alcohol (and allegedly marijuana), and where Father's fiancée allegedly drove home drunk with the Child in the car. After a while, the court did not find counsel's questions to be relevant, particularly because Father was not present at the party. The court admonished counsel several times before ultimately terminating the cross-examination. *Id.* at 75-76. Counsel responded she had simply been trying to lay a foundation. The court told counsel that it had already provided ample leeway:

| The court: | [Counsel], you really are out of line. You have to ask questions with [a] good faith basis, and you are not doing that. All you are doing here is acting like a horrible smear campaign on somebody with no offer of real evidence. |
|---|---|
| Mother's Counsel: | Oh my God. It is, Your Honor. We have pictures and everything. |
| | […] |
| The court: | If you have evidence that you want to put on [direct examination of Mother], that's fine. This cross-examination has ended. […] And all you want to do is ask repeatedly over and over again questions that have been asked and answered about five different ways. We are done. […] |
| Counsel: | I have other questions for the record. I'm entitled to do that. |
| The court: | [Counsel], I am done with your cross-examination. You think you can ask any question you want, and that's not going to be done in this courtroom. […] I know, I know. There's no record here because I have counsel who literally |

- 15 -

|               | thinks she runs the show. I am so tired of this, [counsel]. You are in contempt.[8] That is it. And as a result of that, I am stopping you having any cross-examination because you don't follow what this court is trying to do to make a fair hearing for everybody. |
|---------------|-----------------------------------------------------------------------------|
| Counsel:      | Your Honor, I am trying. May I make an offer of proof?                       |
| The court:    | You are not sorry, [counsel]. You are far from being sorry.                  |

*Id.* at 77-78 (footnote added).

At this point, the trial court asked if Father's counsel wished to re-direct. Father's counsel declined, and Mother's counsel began her case-in-chief.

On appeal, Mother argues the trial court deprived her a meaningful opportunity to be heard. While we have significant concerns with the comportment of both the trial court and Mother's counsel (as discussed *infra*), we do not find that the court deprived Mother of her opportunity to be heard when the court terminated counsel's cross-examination of Father. The court initially allowed Mother's counsel to pursue her desired line of questioning to determine whether Father's testimony would be relevant to its contempt decision. Once the court determined that the Child's attendance at the birthday party was irrelevant to the question of whether Father violated the custody order, the court terminated this line of questioning. We cannot find that this was improper. *See Commonwealth v. Rosser*, 135 A.3d 1077,

_____

[8] Apparently, the only sanction for counsel's contempt was the termination of her cross-examination.

- 16 -

1087 (Pa. Super. 2016) (*en banc*) ("[T]he trial court has broad discretion regarding 'both the scope and permissible limits of cross-examination[;]' [t]he trial judge's exercise of judgment in setting those limits will not be reversed in the absence of a clear abuse of that discretion, or an error of law.") (citing ***Commonwealth v. Briggs***, 12 A.3d 291, 335 (Pa. 2011)).

We are more troubled by the trial court's decision to preclude any further cross-examination, but we conclude that the matter is ultimately moot. We reiterate that this portion of the hearing concerned only whether the parties were in contempt. In the end, Mother successfully proved Father was in contempt, thus Mother was not prejudiced by the court's ruling. ***See*** Order of Court, 7/26/21 at 4. Insofar as Mother meant to demonstrate, through cross-examination of Father, that her withholding was justified, Mother was able to make such an argument during her direct examination.

Mother alleges another instance of the court preventing Mother's counsel from cross-examining Father. This time, the alleged error occurred during the custody portion of the hearing. After Father's direct testimony, the court cautioned Mother's counsel that she should not use the cross-examination of Father to authenticate her hundreds of exhibits, as they can best be authenticated during Mother's case-in-chief. ***See*** N.T., 7/20/21 (Day 2) at 255. Counsel stated that she understood but asked to reserve time to cross-examine Father if needed. The court agreed, and counsel proceeded to Mother's direct-examination. ***Id.*** at 258-59. Later, Mother's counsel stopped in the middle of her direct examination of Mother to cross-examine Father;

- 17 -

Mother sought to authenticate Father's use of the Child's cellphone. After failing to authenticate the cellphone, counsel returned to her direct examination of Mother, and eventually rested without cross-examining Father any further. *Id.* at 408. Unlike the first day of the hearing, the trial court did not terminate Mother's cross-examination of Father. Thus, in both instances, we conclude the court did not deprive Mother of her right to due process.

Next, Mother alleges the trial court deprived her of an opportunity to be heard when it precluded her from calling witnesses. *See* Mother's Brief at 36, 43. On the second day, Mother planned to call both maternal grandparents, and the maternal great-grandmother. *See* N.T. (Day 2) at 15. The court was concerned with the time constraints, and asked Mother to make a proffer of her witnesses' testimony. Mother's counsel proffered that the witnesses would testify about their relationship to the Child and the Child's experience living with Mother in Virginia. *Id.* at 16. The court questioned the relevancy of this testimony and whether the testimony would be redundant. *Id.*, at 15-16, 25.[9] Mother argued further that the maternal grandfather's testimony could be used to impeach the GAL's report and testimony – *i.e.*, the grandfather would testify the GAL had not met with Mother long enough to render accurate findings. *Id.* at 30.

_____

[9] Father's counsel offered to stipulate that they had no concerns about the condition of Mother's home, and that the Child had a wonderful relationship with the maternal grandparents and the great-grandparent. *Id.* 19.

The court directed Mother to pick one family member to testify about the Child's life in Virginia. As to whether the grandfather could be called to impeach the GAL, and the court agreed to consider Mother's request after the lunch break – *i.e.*, after the GAL testified. *Id.* at 31. But Mother's counsel did not raise the issue again. *Id.* at 163. At no point did counsel object to the court's ruling about the order of witnesses, nor did counsel attempt to call any of her witnesses thereafter. This contention is waived. *See* Pa.R.A.P. 302(a) (issues not raised in the lower court are waived and cannot be raised for the first time on appeal.).[10]

Next, Mother alleges the trial court precluded her from authenticating and introducing some of Mother's exhibits into evidence. Mother had proposed over 900 exhibits. Some were admitted, some were not. On appeal, Mother cannot pinpoint where in the record the trial court prevented her from authenticating her exhibits, nor where the court ruled that certain exhibits were inadmissible. Indeed, Mother does not allege any evidentiary rulings were made in error. She merely articulates her general disapproval with how the court conducted its proceedings. This contention is also waived. *See* Pa.R.A.P. 302(a); *see also* Pa.R.A.P. 2119(e) ("Statement of place of raising or preservation of issues"); *and see* Pa.R.A.P. 2101 ("Conformance with Requirements.").

_____

[10] Even if not waived, the trial court has discretion to limit the number of witnesses, and Mother did not establish that the court abused its discretion. *See* Pa.R.C.P. 223(1) ("Conduct of the Trial. Generally."); *see also* *Commonwealth v. Walsh*, 36 A.3d 613, 621 (Pa. Super. 2012).

In a similar vein, Mother argues the court did not let the parties perform direct and cross-examinations as they saw fit. Mother reasons the court should have continued the hearing for a third day. However, Mother did not request a continuance. And again, Mother cannot cite to any specific rulings from the record, nor instances where she preserved her objection, nor does she provide support from relevant legal authorities. This contention is also waived.

Finally, Mother argues the trial court improperly outsourced its custody determination to the GAL. She relies on our decision *Interest of L.B.*, 229 A.3d 971 (Pa. Super. 2020). In *L.B.*, the juvenile court suspended the appellant-parent's visits with the child pending the recommendation of the child's therapist. *L.B.*, 229 A.3d at 974. We explained that the trial court was the ultimate arbiter of whether visitations should resume, and that the court erred when it outsourced such a decision to the child's therapist. *Id.* at 977-78.

Instantly, Mother argues that the trial court committed the same error. We disagree. Preliminarily, we note the GAL did not make custody recommendations, but simply provided findings about the Child's best interests. The trial court's thorough Section 5328(a) and 5337(h) analyses reveal that the court did not defer to the GAL. If anything, the court simply agreed that the GAL's impressions of the Child matched the court's impressions from its two *in camera* interviews. We discern no error.

To summarize this portion of our discussion, we conclude the trial court's procedural rulings did not infringe upon Mother's right to due process. Mother largely failed to preserve her contentions, but to the extent that she properly raised certain issues, we find that the court's procedure did not deprive Mother of a meaningful opportunity to be heard, nor did the procedure substantially affect Mother's rights. *See S.T.*, 192 A.3d at 1161, 1164; *see also* Pa.R.C.P. 126.

Our discussion now shifts to Mother's second category of due process errors – namely, whether the trial court evinced bias. As noted above, due process encapsulates the right to defend oneself before an impartial tribunal. *J.M.*, *supra.* Mother argues the court displayed "blatant hostility" towards both Mother and counsel in the following ways:

- The court continuously interrupted Mother's counsel before she could even complete her question, thereby making inappropriate and premature rulings because she misapprehended the purpose behind the question.

- The court kept interrupting testimony with her own questions and/or statements that were not just for clarification.

- The court made its own objections, make rulings as if somebody had made an objection and/or would ask opposing counsel if he had an objection.

- The court made disparaging remarks to both Mother and Mother's counsel.

*See generally* Mother's Brief at 43-46.

We begin with Mother's claims that the trial court repeatedly interrupted her. Many of these contentions arose from curt exchanges between counsel

- 21 -

and the trial court, usually after an objection. The court also felt compelled to interject throughout the hearing to focus the sprawling testimony. In one cited example, the court directed Mother's counsel to move on after explaining that the question had been previously addressed several times. *See* N.T. (Day 1) at 61. Mother also cites examples of when the trial court interrupted testimony to ask clarifying questions. *See, e.g.,* N.T. (Day 2) at 265-268. Sometimes the court's questions were not for clarification, but to gauge the witnesses' credibility. *Id.* at 301-05. Mother cites still other instances where the court interjected to ask Father's counsel if he had an objection – the inference being that the trial court sought to make Father's case for him. *Id.* at 268.

Mother argues the trial court's interruptions evince its bias. We disagree. Trial courts have discretion to conduct their proceedings to ensure judicial economy. To be sure, there are examples where trial courts have gone too far in their pursuit of efficiency. *See, e.g., C.T. v. A.W.T.*, -- A.3d. --, 2020 WL 1518095 (Pa. Super. 2020) (non-precedential decision) (holding that the trial court deprived a parent of a meaningful opportunity to be heard when the court terminated witness testimony to avoid a continuance);[11] *see*

---

[11] Per 210 Pa. Code § 65.37 (Non-Precedential Decisions (formerly titled Unpublished Memoranda Decisions), non-precedential decisions filed after May 1, 2019, may be cited for their persuasive value. *See also* Pa.R.A.P. 126(b).

*also Interest of T.M.W.*, 232 A.3d 937, 947 n.13 (Pa. Super. 2020) (noting with disfavor the trial court's repeated interruption of the witness.).

Here, however, Mother's cited examples are not demonstrative of the trial court's bias. For one, we do not share Mother's inference that the court sought to make Father's case when it asked whether he had an objection. A court does not evince its bias simply because it anticipates an objection. But to Mother's larger point, that the court's frequent interruptions hamstrung her case, we must recognize the trial court's role in a custody/contempt dispute.

The trial court sat as fact-finder and had an obligation to excavate the salient details from an unfocused, consolidated hearing. We agree that the court's interruptions were numerous. Perhaps the court should have refrained unnecessary commentary and allowed the litigants to present their case with less interference. Perhaps whatever time the court saved by focusing the hearing was lost during the court's frequent tangents, interjections, and sidebars. Then again, if the litigants were left to their own devices, they might have opted to present hours of irrelevant testimony and evidence, leaving the court with little to make an informed decision. In the end, we cannot conclude that the trial court's injections revealed its partiality or otherwise deprived Mother of an opportunity to be heard. The court always ensured it understood Mother's arguments. **See, e.g.,** N.T. (Day 2) at 355. Mother was heard, just not believed.

Finally, we address what Mother's counsel refers to as the trial court's "disparaging remarks." According to Mother, these remarks reveal that the

custody award was the result of the court's "partiality, prejudice, bias or ill will." **See** Mother's Brief at 38-39. In her Brief, Mother cites a series of hostile exchanges between counsel and the trial court. The more pertinent of these, we restate here:

| | |
|---|---|
| Mother's Counsel: | You are interrupting me. Look at [Exhibit 449]. |
| The court: | [Counsel], I get it. I'm not going to let you have that demeanor and talk to me that way. |
| | […] |
| Counsel: | You're preventing me from doing my own job and interrupting. ***Can you please look at damn 449?*** |
| The court: | [Counsel], you are out of line. You are out of line and that is it. You are done. I am not sure why you think you can talk to a judge that way. Where do you get off thinking you can talk to a judge that way? Where in the heck? And don't tell me you've been doing this for 33 years, I don't want to hear that. Because by now, ma'am, you should have learned how to be a proper, respected lawyer and you are not. ***You are totally a disgrace talking to me that way***. I will talk to your client and ask her questions when a point comes up. I wanted to know what her response is and she gave it to me. Do not tell me I am not allowing you to do your job. I have given you so much leeway. |
| Counsel: | You interrupted me in the middle of my direct, Your Honor. |
| The Court: | Tough luck. I'm allowed to interrupt. |

| Counsel: | You're not allowed, Your Honor, and I object. |
|---|---|

*See* N.T. (Day 1) at 115-16 (emphasis added).

The tempers did not cool after the first day of the hearing. On the second day, Mother's counsel told the court during a hearsay objection, "Look, if you have a problem with me, Your Honor, then recuse yourself from my cases." *See* N.T. (Day 2) at 28.

Mother's counsel cites additional remarks:

| The court: | …I have to follow the evidentiary rules. [Mother] can testify, but she can't [read from her log of Father's lateness and no-shows during custody exchanges] as an exhibit. She can testify that-- |
|---|---|
| Counsel: | She actually can, Your Honor. If I may, when you write a contemporaneous document, like a diary, basically saying, "Today -- |
| The court: | [Y]ou're overruled. Do not explain evidence to me, [counsel]…I really don't like when you do that. ***Do you do that to everybody or is that just something – you somehow think that I'm stupid? [Counsel], I don't need you to explain evidentiary rules to me.*** I have just said my ruling. It is not admissible. |

*Id.* at 268-69 (emphasis added).

| The court: | You cannot sit here and argue with me and try to somehow school me on evidentiary issues. |
|---|---|
| Counsel: | I'm not trying to school you. |
| The court: | Yes, you are. |
| Counsel: | That's your own insecurity. That's – |

| | |
|---|---|
| The court: | [Counsel.] You're very – disrespectful to this court. |

*Id.* at 292.

The most troubling excerpt came from the aforementioned testimony about the custody exchange at the police station. ***See generally id*** at 306-22.  Mother claimed that she only asked the officer at the station to speak to the Child out of concern for the Child's well-being, but she maintained the officer did not subject the Child to formal investigatory interview. *Id.* at 313.

| | |
|---|---|
| The court: | What do you [(Mother)] think they do, ma'am? You are bringing a crying child to them.  They're not there to say, "Oh, here, have a lollipop and have a balloon." At that point, [their training is] kicking in, "this parent obviously thinks something bad happened." They must, at that point – they're under a mandate to investigate, and they interviewed her.  They— |
| Counsel: | No, they can – […] Your, Honor if you let her finish – |
| The court: | [Counsel,] that is not what police do. You don't run – |
| Counsel: | Well, I'm so glad you were there and knew what happened. |
| | […] |
| The court: | Please, you can stop speaking right now. I'm speaking. |
| Counsel: | You're making a lot of assumptions – |
| | […] |
| The court: | Let's move on. |
| Counsel: | No, I'd like my client [(Mother)] to explain, for the record, exactly what did happen and |

when the child spoke to an officer [during the custody exchange], so that it's clear, and so that Your Honor—

The court: [Counsel], she had the child interviewed by a police officer.

Counsel: --no, she didn't.

The court: [Counsel,] you are not going to ever do that again.

Counsel: She didn't, Your Honor.

The court: All right. Can you [(the judicial staff)] get the sheriff because I – I'm not having this in my courtroom? You literally don't know when to stop, do you?

Counsel: What have I done, Your Honor?

The court: What do you mean, what have you done? You're—

Counsel: I'm trying to—

The court: --mocking me.

Counsel: --protect my client.

The court: You're mocking me.

Counsel: You're slapping your hands at me like I'm a child.

The court: I am trying to conduct a hearing in the child's best interest. I am telling you—

Counsel: I know you're trying that.

[…]

The court: […]I told you to move on to the next issue. You told me no. You told me you were going to go ahead and ask her all the questions to say –

Counsel: I didn't say that.

[…]

The court: You told me you were not doing that. You were going to – were going to ask her-

Counsel: I didn't say I'm not –

The court: […] Now, apparently, somehow, now you're saying, "Oh, no, no, no, no, I didn't say that," but, [counsel], don't you dare call me a liar. The record reflects itself.

[…]

The court: You can continue, but I'm telling you, one more, and you are in contempt. I have – I'm [not] doing this anymore, [counsel]. This is not happening. You have literally, at this point, gotten to the point where you think you can have that attitude with this Court. That is not what you're going to do.

Counsel: That's not true, Your Honor.

The court: No, I make a ruling and apparently you want to sit here and educate me on what I'm doing wrong. Move on.

*Id.* at 315-18.

In addition to the exchanges between the trial court and counsel, Mother cites the court's remarks made directly to her. The court made pointed comments, evidently because the court suspected Mother's testimony was not truthful:

The court: This is a two-way street that neither one of these parents is understanding. You're putting this kid in the middle. You're putting her in the middle of whatever this tension is of why the two of you don't understand it's not about you and it's not about you.

*Id.* at 305.

- 28 -

The court: Ma'am, you took your child, who was crying, to go be interviewed by a police officer. There was nothing to look at and say she had injuries, something where, in fact, we would say "Oh, my gosh, you should do that."

She's merely crying, and your first response is, "I had to make sure I got evidence in case there was something wrong, that dad did something in his custodial time." That is what you responded to me, in your own words, trying to say it in such a way to make it sound *like you're mom of the year*.

You're not mom of the year when you run to a police officer and subject a child to a – and – and who's already crying.

*Id.* at 309-10 (emphasis added).

The court: So, you guys are playing games, withholding your child, as if she's a puppy.

*Id.* at 327.

The court: So, don't sit here and try to pull the wool over my eyes.

[…]

Well – again, that's what you're saying, and I am finding it not to be truthful. […] Based on all of your testimony in front of [the prior judge], you were not to relocate with the child, and you were to be partial parent only. And you didn't like it, so you went and you wanted to go ahead and get a different ruling in a different [jurisdiction].

*Id.* at 422-23.

After the trial court announced its intention to award Father primary physical and sole legal custody, Mother was naturally upset and informed the court she would appeal. ***See id.*** at 435.

| Mother: | This man has put this child through hel[l] and you're going to put this child in danger. And it won't be until something happens that nobody can fix – |
| --- | --- |
| The court: | Make sure the record is on because mom has just made a threat to the court. |
| | […] |
| The court: | You believe that you know better than everybody. You believe that you are better than what [the previous trial judge] decided. You decided to circumvent by running to Virginia to try to get every order possibly against what [the previous trial judge] did. |
| | […] |
| | You believe you know better. You believe that our analysis means nothing, that you are going to be the ultimate factfinder and you're going…to find a way to keep that child in Virginia, away from [F]ather. |
| Mother: | I believe I've done all I can to protect my child. That's what I believe, Your Honor. |
| The court: | Well, then, you're even giving me stronger evidence of why I know for a fact you cannot have primary custody. And I'm not sure what kind of partial custody you can have. […]. |

***Id.*** at 436-38.

What these excerpts reveal is a regrettable display of a trial court losing patience with an attorney's unbecoming behavior and with a parent, who it

suspected was not being forthright. We remind counsel and the trial court of their duties under the Code of Civility:

> 2. A lawyer should speak and write in a civil and respectful manner in all communications with the court, court personnel, and other lawyers.
>
> 3. A lawyer should not engage in any conduct that diminishes the dignity or decorum of the courtroom.
>
> [...]
>
> 5. A lawyer should abstain from making disparaging personal remarks or engaging in acrimonious speech or conduct toward opposing counsel or any participants in the legal process and shall treat everyone involved with fair consideration.
>
> [...]
>
> 11. A lawyer should be considerate of the time constraints and pressures on the court in the court's effort to administer justice and make every effort to comply with schedules set by the court.

204 Pa.A.D.C. § 99.3(2), (3), (5), (11).

> 2. A judge should show respect, courtesy and patience to the lawyers, parties and all participants in the legal process by treating all with civility.
>
> [...]
>
> 6. A judge should not employ hostile or demeaning words in opinions or in written or oral communications with lawyers, parties or witnesses.
>
> [...]
>
> 10. A judge should allow the lawyers to present proper arguments and to make a complete and accurate record.

204 Pa.A.D.C. § 99.2 (2), (6), (10).

At the risk of debasing these proceedings any further, we remind counsel and the trial court that two wrongs do not make a right. For instance, a Comment to our Rules of Professional Conduct provide:

> Comment: [4] The advocate's function is to present evidence and argument so that the cause may be decided according to law. Refraining from abusive or obstreperous conduct is a corollary of the advocate's right to speak on behalf of litigants. ***A lawyer may stand firm against abuse by a judge but should avoid reciprocation; the judge's default is no justification for similar dereliction by an advocate.*** An advocate can present the cause, protect the record for subsequent review and preserve professional integrity by patient firmness no less effectively than by belligerence or theatrics.

Rules of Professional Conduct 3.5 ("Impartiality and Decorum of the Tribunal) – Comment 4.

Regarding the trial court's comments to Mother, we recognize that the presiding trial judge views and assesses the witnesses first-hand; ascertaining witness credibility is directly within a trial court's purview. *See S.T.*, 192 A.3d at 1160. But while judges are enabled to find a witness's testimony to be misleading or even a downright lie, such deceit does not excuse judges from their obligation to be "patient, dignified, and courteous" to litigants, witnesses, and lawyers. *See* Code of Judicial Conduct Rule 2.8(B). Time constraints are not an excuse either:

> Comment: [1] The duty to hear all proceedings with patience and courtesy is not inconsistent with the duty imposed in Rule 2.5 to dispose promptly of the business of the court. Judges can be efficient and businesslike while being patient and deliberate.

Code of Judicial Conduct Rule 2.8 – Comment 1.

We caution the trial court to heed the warning previously given in ***A.N.P.*** and in ***Commonwealth v. Smith***, 69 A.3d 259 (Pa. Super. 2013):

> Those who look to our courts to invoke a particular right, even if incorrectly, should be met with patience, and with fidelity to the procedures that our law requires, not with intemperance. This fundamental precept derives not only from the [Code] of Judicial Conduct, but also from our society's bedrock precept that the courts are forums of integrity, justice, and equity.

***A.N.P.***, 155 A.3d at 68 (quoting ***Smith***, 69 A.3d at 267-68).

We are sympathetic that the nature of custody proceedings adds a certain degree of pressure on all involved. The rights at stake are fundamental. Childhood is finite, and thus the judicial decisions are to some extent irrevocable. But these are reasons why the court and its officers must rise to the occasion and resist from buckling under the weight of that pressure. The question remains: did any of these remarks constitute a legal error or an abuse of discretion?

We have held:

> The appearance of bias or prejudice can be as damaging to public confidence in the administration of justice as the actual presence of bias or prejudice. However, simply because a judge rules against a party does not establish bias on the part of the judge against that party. Along the same lines, a judge's remark made during a hearing in exasperation at a party may be characterized as intemperate, but that remark alone does not establish bias or partiality.

*Lewis*, 234 A.3d at 722 (Pa. Super. 2020) (quoting ***Commonwealth v. McCauley***, 199 A.3d 947, 950-51 (Pa. Super. 2018) (further citation omitted)); ***see also Interest of D.J.B.***, 230 A.3d 379, 386 (Pa. Super. 2020) (holding that a judge's remark contextualizing the juvenile's delinquent act within the Me Too Movement did not establish bias or partiality).

The judge's remarks in the case were clearly made in exasperation, and they may be rightly characterized as intemperate. Contrary to Mother's argument, the trial court also made disapproving comments to Father. ***See e.g.*** N.T. (Day 2) at 327, 382. Ultimately, the trial court's custody decision was firmly rooted in testimony and evidence, not "partiality, prejudice, bias or ill-will." *Lewis*, *supra*. We reiterate that simply because a judge rules against a party does not establish bias on the part of the judge against that party. ***Id.*** It follows that simply because a judge finds a litigant's testimony lacking in credibility does not establish bias. Surely, Mother's lack of credibility was a significant aspect of the court's analysis. But the court was free to make credibility determinations, and such determinations were not manifestly unreasonable in light of the record.

In sum, we conclude the trial court's opinion did not circumvent Rule 1925(a); the trial judge's courtroom procedure did not deprive Mother of a meaningful opportunity to be heard; and while the comportment of the trial judge and Mother's counsel was less than professional, it does not rise to the level of legal error or an abuse of discretion. Mother was afforded a fair hearing. The court did not commit a due process violation.

Order affirmed.  Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/14/2022